UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AIDA SALEM, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Case No. 12 C 100 |
| UNITED STATES OF AMERICA, | ) |
| | ) Judge John W. Darrah |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Petitioner Aida Salem's *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.

## BACKGROUND

The following factual background is drawn from the criminal record in Salem's criminal case, resulting in a conviction and sentence in this Court. *USA v. Aida Salem*, No. 06-cr-923-3 (N.D. Ill.) (referred to as "Salem Cr. Dk.").

*Trial Court Proceedings*

On June 28, 2007, a superseding indictment charged that Aida Salem, Raimondoray Cerna ("Cerna"), Adrian Ianc ("Ianc"), other codefendants,[1] and individuals located outside the United States knowingly devised and participated in a scheme to defraud. The charges stem from a wide-ranging fraud scheme, running from approximately November 2003 to August 2006, in which more than 2,000 victims of the

---

[1] These codefendants are: Adrian Fechete, Gabriel Constantin, Mihai Bledea, Gary Schneider, Jessie Vega, Mihail Hann, Igor Aslan, Ioan Moloman, Bogdan Ganescu, Marian Alexandru, Radu Rizescu, Gianina Simon, Cristian Bentan, Constantin Lucan, Stefan Dumitru, Muszka Ladislau, Mihai Panaitescu, and Lucian Nanau.

scheme were fooled into believing that that they were purchasing items listed for sale on Internet sites and wired funds to the codefendants in amounts totaling in excess of $6 million but never received the items.

On September 5, 2007, Salem pled guilty, pursuant to a written plea agreement, to one count of wire fraud, in violation of 18 U.S.C. § 1343. Salem participated in the scheme from approximately November 2003 to January 2006. In November 2003, Salem learned from Cerna of an internet fraud scheme being run by individuals in Romania (the "Foreign Co-Schemers") in which victims of the scheme were directed to send money via Western Union to currency exchanges in Chicago. The Foreign Co-Schemers posed as on-line sellers of various items on internet sites, such as eBay, and convinced the victims to send money for items that had been listed on the interest sites to co-schemers in Chicago, who were working in concert with the Foreign Co-Schemers.

To receive funds transmitted by the victims, Salem presented himself to Western Union agents using alias identification documents. While participating in the scheme, Salem shared information on currency exchanges with his co-schemers, such as which currency exchanges to avoid and which were favorable when receiving victims' funds. Salem also shared rides with his co-schemers to receive victims' wire transfers and occasionally traveled with Ianc to receive fraud proceeds from Western Union agents.

During the course of his participation in the scheme, and through the use of more than a dozen aliases, Salem personally received approximately 170 wire transfers of funds from victims of the scheme in amounts totaling in excess of $400,000. Salem

admitted that he was aware of his co-schemers, such as Ianc, and numerous other codefendants. During the time Salem participated in the scheme, approximately 2,100 victims lost more than $5.3 million to the fraud scheme.

Salem was sentenced on May 22, 2008. In his position paper and at the sentencing hearing, Salem conceded that he should be held accountable at sentencing for the losses caused by Cerna and Ianc, who recruited him into the scheme. (*See* Salem Cr. Dkt. No. 528 at 8.) At sentencing, the Government argued that Salem should be accountable for in excess of $1 million but less than $2.5 million in losses.

At sentencing, this Court found that it was reasonably foreseeable to Salem that over a 1,000 victims would suffer losses in excess of $1 million but less than $2.5 million in losses. This finding resulted in a sixteen-point increase in Salem's offense level for the loss amount and a six-point increase because the offense involved more than 250 victims, pursuant to United States Sentencing Guideline ("USSG") § 2B1.1.

Accordingly, this Court found that, under U.S.S.G. § 2B1.1(a)(1), Salem's base offense level was seven and added sixteen levels based on the amount of the loss, U.S.S.G. § 2B1.1(b)(1)(I), and added six levels based on the number of victims, U.S.S.G. § 2B1.1(b)(2)(c). Salem's criminal history category level was II. The Court sentenced Salem to a within-Guideline sentence of 97 months' imprisonment and ordered him to pay $404,091 in restitution.

*Salem's First Appeal*

Salem appealed from this sentence. On March 9, 2010, the Court of Appeals remanded Salem's sentence for further findings concerning the scope of the jointly

undertaken criminal activity. *United States v. Salem*, 597 F.3d 877 (7th Cir. 2010) (*Salem I*). Specifically, the Court of Appeals directed this Court to "first determine the scope of the criminal activity that . . . Salem agreed to jointly undertake." *Id.* at 890. Second, this Court was directed to "determine whether the acts of Fechete, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau were in furtherance of that jointly undertaken criminal activity." *Id.*

Furthermore, the Court of Appeals determined that Salem had waived the right to challenge the district court's decision to hold him accountable at sentencing for the acts of Cerna and Ianc. *Id.* Salem did not challenge this Court's finding that these co-schemers' acts were reasonably foreseeable to him on appeal. Accordingly, the Court of Appeals directed the following on remand:

> Accordingly, on remand, the district court must first determine the scope of the criminal activity that Salem, Ganescu, and Simon agreed to jointly undertake. Then, with respect to Salem, the court must determine whether the acts of Fechete, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau were in furtherance of that jointly undertaken criminal activity. Salem has not challenged the district court's finding that these co-schemers' acts were reasonably foreseeable to him. So, if the district court finds that the acts of these co-schemers were in furtherance of Salem's jointly undertaken criminal activity, then the relevant conduct findings and Salem's sentence shall stand, provided appropriate findings are made with respect to Bledea. Otherwise, the district court must reassess its relevant conduct findings and Salem's sentence.

*Id.* at 890.

## Salem's Resentencing

On remand, Salem and the Government filed additional written sentencing memoranda in advance of the resentencing hearing. On November 10, 2010, this Court held a joint sentencing hearing for Salem and Ganescu. In his filings and at the sentencing hearing, Salem asked the Court to reconsider Salem's liability for the conduct of Cerna and Ianc by contrast to Salem's prior concessions.

At the hearing, this Court found that Salem agreed to jointly undertake criminal activity with Cerna, Ianc, Constantin, and other codefendants, and the conduct of these co-schemers was in furtherance of Salem's jointly undertaken criminal activity. As the Court of Appeals noted in Salem's second appeal, discussed below, the "[district court] included Cerna and Ianc even though it thought Salem waived any issue as to his accountability for their conduct." *U.S. v. Salem*, 657 F.3d 560, 563 (7th Cir. 2011) (*Salem II*).

This Court determined that Salem's total offense level was 28 and that his criminal history category was II. The Court imposed a within-Guideline sentence of 97 months' imprisonment.

## Salem's Second Appeal

Salem appealed this sentence. The Court of Appeals affirmed Salem's sentence, holding:

> On remand, the district court made appropriate findings regarding jointly undertaken criminal activity, and its findings are well-supported by the record and reasonable inferences drawn therefrom. In this case, there is a single

5

> scheme, similarities in modus operandi, coordination of activities among co-schemers, and sharing of resources, including information and rides to currency exchanges. Further, both Salem and Ganescu knew of the scope of the scheme and participated in it fully and for a lengthy time period – more than two years.
>
> * * *
>
> The evidence raised a reasonable inference that Salem and Ganescu and the co-schemers identified by the district court were working together in jointly undertaken criminal activity, as opposed to working independently and autonomously. By working together and coordinating their efforts, Salem and Ganescu assisted and furthered (or promoted) the other co-schemers' criminal acts which were part of the joint criminal activity. Contrary to the defendants' assertion, and as the record shows, the district court did not conclude that by participating in the scheme, Salem and Ganescu agreed to advance the goals of the entire scheme and are thus accountable for jointly undertaken activity. Their assertion is further undermined by the fact that they were not held accountable for the conduct of all the Chicago area defendants.

See *Salem II*, 657 F.3d at 565.

## LEGAL STANDARD

Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (2006). The relief described in this section is available only if there was "an error of law that is jurisdictional, constitutional, or constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Bischel v.*

*United States*, 32 F.3d 259, 263 (7th Cir. 1994) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1992)). The district court must review the record and draw all reasonable inferences in favor of the government. *See Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992). However, Salem filed this petition *pro se*; therefore, his position is entitled to a liberal reading. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).

## ANALYSIS

In Grounds One and Two, Salem brings claims based on the ineffective assistance of counsel. In Grounds Three and Four, Salem argues that the trial counsel and appellate counsel made certain errors and that his sentence was unreasonable, respectively.

*Ineffective Assistance of Trial and Appellate Counsel*

Salem argues that his trial court counsel was ineffective in the first district court proceeding because he conceded that Salem should be held accountable for the conduct of Ianc and Cerna.

A claim that could have been raised on appeal is procedurally defaulted if not raised in the appeal. *Ballinger v. United States*, 379 F.3d 427, 429 (7th Cir. 2004). But the failure to raise an ineffective-assistance-of-counsel claim on appeal does not constitute a waiver of a claim by a defendant under Section 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

Claims of ineffective assistance of counsel are reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) (*Strickland*). Under this test, a defendant must show both: (1) that counsel's performance fell below an objective standard of reasonableness under the circumstances and (2) that the deficient

7

performance prejudiced the defendant. *Id.* at 688-94. To establish prejudice, the petitioner must prove that there is a reasonable probability that the proceeding would have had a different result but for the unprofessional errors. *Id.*

The Court's "review of the attorney's performance is 'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted); *Cooper v. United States*, 378 F.3d 638, 641 (7th Cir. 2004) ("Defense counsel is strongly presumed to have rendered adequate assistance and to have made significant decisions in the exercise of his or her reasonable professional judgment.").

Salem has failed to satisfy the first *Strickland* prong because he has failed to show that his trial counsel's performance fell below an objective standard of reasonableness under the circumstances. Salem's trial counsel's concession that Salem was responsible for Cerna and Ianc's conduct was based on a strategic decision, motivated by several factors. First, the admissions in Salem's plea agreement closely linked him to Cerna and Ianc. (*See* Salem Cr. Dkt. No. 264 at 4-5, 8, 17.) Second, Salem's trial counsel's decision was part of a broader strategy to argue that Salem should not be held accountable for the conduct of his *other* codefendants. Importantly, the Government argued, and Probation agreed, that Salem should be held accountable for the codefendant conduct of Fechete, Constantin, Moloman, Hann, Alexandru, Panaitescu, Lucan, Dumitru, and Nanau.

Finally, Salem's trial counsel's concession also strengthened Salem's case for a downward departure for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. As the Court of Appeals observed, "Salem's decision to make such a concession appears to have been strategic. Salem was anticipating a reduction in his offense level for acceptance of responsibility. Had he disputed his accountability for Cerna's and Ianc's conduct, that reduction may have been in jeopardy." *Salem I*, 597 F.3d at 890. Based on these factors, Salem's trial counsel's decision was sound sentencing strategy "within the wide range of reasonable professional assistance," and Salem was not denied effective assistance of counsel. *U.S. v. Norwood*, 798 F.2d 1094, 1101 (7th Cir. 1986) (holding that trial counsel's decision to not call defendant at sentencing hearing "can be considered sound trial strategy within the wide range of reasonable professional assistance" and concluding that defendant " was not denied effective assistance of counsel."); *see also United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (holding that upon evaluating whether counsel's performance was reasonable, the court should not "second-guess counsel's strategic decisions or take up the role of the 'Monday morning quarterback.'").

Because Salem has failed to make a proper showing under the first *Strickland* prong, the Court need not consider the sufficiency of the other prong. *Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir. 1993) ("A defendant's failure to satisfy either prong is fatal to his claim."). But in any event, Salem has not shown he suffered any prejudice by his trial court counsel's decision. At Salem's first sentencing, this Court found that Salem should be held liable for losses in excess of $1 million but less than

which Salem was held accountable at the first and second sentencings was within the range of loss contemplated by the plea agreement.

Salem next argues that his appellate counsel in his second appeal was ineffective for failing to appeal the reasonableness of his 97 months' imprisonment. (Pet. at 36.) Here, appellate counsel's decision not to argue a meritless issue cannot be considered unreasonable. At the second sentencing hearing, the Court held that the Guildeline range was 87 to 108 months' imprisonment. (1/25/11 Hr'g Tr. at 39, Salem Cr. Dkt. No. 971.) Salem, therefore, received a sentence in the middle of the applicable Guideline range.

Last, at the end of his ineffective-assistance-of-counsel arguments, Salem includes a laundry-list of claims relating to the ineffective assistance of counsel. (Pet. at 25.) Apart from merely listing his complaints, Salem's arguments are not developed. Therefore, the Court does not address them. *United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) (stating that a court is not required to address a petitioner's ineffective-assistance-of-counsel arguments "which are undeveloped.").

Accordingly, for the reasons set forth above, Grounds One and Two of Salem's petition are denied.

### *Grounds Three and Four*

In Ground Three, Salem argues that the district court erred by not reconsidering whether Salem should be held accountable for his codefendants' conduct. This argument has been previously decided and rejected by this Court. In Ground Four, Salem argues that his sentence is unreasonable. This argument is procedurally barred because he failed to raise this argument in a direct appeal. Constitutional issues not raised on direct appeal

are barred in a collateral review unless a defendant can show good cause for the procedural default and actual prejudice from the failure to appeal. *Belford v. United States*, 975 F.2d 310, 313 (7th Cir.1992). Salem has not shown either.

*Certificate of Appealability*

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Salem a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in this Order.

A *habeas* petitioner does not have the absolute right to appeal a district court's denial of his *habeas* petition; instead, he must first request a certificate of appealability. *See Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). A *habeas* petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Under this standard, Salem must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (*Slack*)).

In cases where a district court denies a *habeas* claim on procedural grounds, the *habeas* court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 485.

Here, reasonable jurists would not debate that Salem's ineffective-assistance-of-counsel claims should have been resolved in a different manner. Furthermore, reasonable jurists would not debate that Salem's claims in Grounds Three and Four are barred. Therefore, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the reasons set forth above, Aida Salem's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence [1] is denied. A certificate of appealability is not issued. Salem's request for an evidentiary hearing is denied.

Date: 5-3-12

JOHN W. DARRAH
United States District Court Judge